```
                IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TENNESSEE
                          WESTERN DIVISION
```

─────────────────────────────────────────────────────────

```
                                  ϰ
LAMAR ROSS,                       ϰ
                                  ϰ
        Petitioner,               ϰ
                                  ϰ
vs.                               ϰ        No. 10-1093-STA-egb
                                  ϰ
TONY PARKER,                      ϰ
                                  ϰ
        Respondent.               ϰ
                                  ϰ
```

─────────────────────────────────────────────────────────

ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
ORDER DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

─────────────────────────────────────────────────────────

On April 19, 2010, Petitioner Lamar Ross, Tennessee Department of Correction prisoner number 367106, an inmate at the Northwest Correctional Complex ("NWCX") in Tiptonville, Tennessee, filed a *pro se* petition pursuant to 28 U.S.C. § 2254. (ECF No. 1.) On April 26, 2010, Ross paid the filing fee. (ECF No. 3.) On May 4, 2010, United States District Judge J. Daniel Breen transferred the petition to the Western Division of this district and directed the Respondent to file the state-court record and a response to the petition. (ECF No. 4.) Respondent filed an answer to the petition and the state-court record on June 28, 2010. (ECF Nos. 8 & 9.)

I.    STATE COURT PROCEDURAL HISTORY

On October 17, 2002, a grand jury sitting in Shelby County, Tennessee, indicted Petitioner Ross on two counts of

aggravated rape. (Indictment, ECF No. 9-1 at 7.)[1]  On September 24, 2003, following a jury trial in the Criminal Court for Shelby County, Tennessee, Petitioner was convicted of both counts which the trial court merged into a single judgment of conviction. (ECF No. 9-1 at 17-18.) Ross was sentenced to twenty-four years in prison as a Range I, violent offender. (Notice of Enhancement Factors, ECF No. 9-1 at 19-22; Judgment, ECF No. 9-1 at 40.) The Tennessee Court of Criminal Appeals modified the conviction on count two to rape, a Class B felony, the actual offense charged; concluded that two of the four enhancement factors were inapplicable under Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004); and reduced Ross' sentence to twenty-two years in prison. State v. Ross, No. W2003-02823-CCA-R3-CD, 2004 WL 2715348 (Tenn. Crim. App. Nov. 22, 2004), *perm app. denied* (Tenn. May 31, 2005).

On December 13, 2005, Ross filed a *pro se* petition pursuant to the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 to -122, in the Criminal Court for Shelby County. (Pet. for Relief from Conviction or Sentence, ECF No. 9-7 at 20-57.) Counsel was appointed to represent Ross (Order, *id.* at 68), and an amended and supplemental petition was filed on September 28, 2007. (Am. Pet. For Post-Conviction Relief, *id.* at 69-78.)  An evidentiary hearing was held, and on May 20, 2008, the post-

---

[1]     Page citations are to the district court record docket entries.

conviction court issued an order denying relief. (Order, *id.* at 81-92.) The Tennessee Court of Criminal Appeals affirmed.  Ross v. State, No. W2008-01130-CCA-R3-PC, 2009 WL 2568202 (Tenn. Crim. App. Aug. 20, 2009), *perm. app. denied* (Tenn. Jan. 25, 2010).

The facts underlying Petitioner's conviction are set forth in the opinion of the Tennessee Court of Criminal Appeals on direct appeal:

> The victim in this case, J.F.,[2] is a resident of the Barry Homes, a Memphis public housing development reserved for the physically and mentally disabled. At approximately 11:50 p.m. on July 1, 2002, the victim reported to Carolyn Delbridge, a Memphis Housing Authority criminal investigator assigned to the building, that earlier in the day a man had enticed him into walking with him to a nearby abandoned public housing complex, where he had forced the victim at knifepoint to perform oral sex and had penetrated him anally with his penis. From the victim's description, Delbridge recognized Lamar Ross, who was a regular visitor in the Barry Homes, and whom she had seen in the building earlier that afternoon.

> The victim subsequently led Delbridge, her supervisor, and a group of Memphis police officers to the abandoned housing complex and pointed out the room in which the rape occurred. There, the officers discovered Ross asleep on the floor, a gray knife matching the victim's description of the weapon used in the attack underneath a blanket beside his left hand. In addition, the victim immediately identified Ross as the perpetrator when the officers removed him from the room. As a result, Ross was arrested and charged with two counts of aggravated rape, based on his use of a weapon in the attack and his rape of a victim he knew or had reason to know was mentally defective.

> At Ross' September 22-24, 2003, trial, the victim testified he was forty-one years old and had lived in the

---

[2]    It is the policy of this court to identify victims of sexual assault by their initials only.

3

Barry Homes Housing Development in downtown Memphis for the past two years and four months. He said he was sitting outside the building on July 1, 2002, when a man dressed in blue jeans and a black shirt with a black design approached and asked him to accompany him to where he was living, saying something about wanting to show the victim a "cat hole" and also about having the victim play basketball with him. The victim said he declined, but the man grabbed him by the arm and told him to come with him, repeating that he had something to show him. As they walked together down the street, the man introduced himself to the victim as "Lamar Ross."

After leading the victim into an upstairs vacant room inside the nearby abandoned Lauderdale Court housing project, the man suddenly pulled down his clothes, telling the protesting victim that he had to "do [his] job." The victim said he refused and tried to leave, but the man grabbed him by the neck, pulled out a gray knife, and threatened that he would be "a dead sucker" if he did not "suck his penis." Because he was afraid the man would hurt him, the victim complied. He said that afterwards, the man forced him to lower his pants and then penetrated his rectum with his penis four times, which hurt him. When finished, the man forced him to wait and walk back toward the Barry Homes complex with him, threatening that the victim was "gonna get [his] butt kicked again" if he refused.

The victim testified that when he returned home he first related the incident to the manager of his building, who refused to help, and later to Ms. Delbridge, the building's security officer, who called her supervisor and the police. After describing the rapist, he led officers to the abandoned housing complex, where the police discovered a man fitting the rapist's description asleep in the room where the incident occurred. The victim testified he immediately recognized and identified the man as the perpetrator when the police brought him out of the room. However, the victim was unable to identify Ross at trial.

On cross-examination, the victim testified he completed the eleventh grade but did not graduate. He was unsure of the exact time the incident occurred, but was confident it was before dark. He was also confident that Ross told him his name was "Lamar Ross." He acknowledged he had reported the time of the incident as 4:00 p.m. in

4

his statement to police, and had said that Ms. Delbridge
told him the perpetrator's name was Lamar. He testified
he described the perpetrator as a tan or "khaki-skinned"
man with facial hair, shorter than he was, and dressed in
blue jeans, a black shirt, and white tennis shoes. The
victim said he did not think Ross had been wearing a
condom, and he did not ejaculate in his mouth. He denied
having told anyone that Ross ejaculated, but said he had
mentioned that he saw "some white stuff caked around
[Ross'] penis," which had an "ill smell to it." The
victim acknowledged he told police that he was 5' 6" and
thought his assailant was six feet tall. He was unable to
say whether six feet was taller than his height, but
indicated that the man who raped him came up to his ear.
On redirect, he affirmed that he had been able to point
out Ross to the judge in an earlier court proceeding in
the case.

Carolyn Delbridge testified she was working at the
Barry Homes as a criminal investigator for the Memphis
Housing   Authority   on   July   1,   2002,   when   the
"crying-shaken-real distraught" victim came to her at
11:50 p.m. and reported that "somebody made him put their
nasty thing in his mouth." She said the victim related
that he had been sitting on the stoop when a man wearing
dark jeans, a black long-sleeved shirt with white writing
on it, and white tennis shoes asked him for a beer. The
victim told her that he refused to buy him a beer, and
the man asked him to accompany him to the store. However,
when   they   reached   the   abandoned   Lauderdale   Court
Apartments, the man "pushed ... and shoved him" inside an
apartment, pulled a gray knife, forced him to go upstairs
into a room with a folded blanket on the floor and a pink
candle in the window, and then made him perform oral sex
and anally penetrated him. Delbridge stated that the
victim did not know what a condom was, but answered in
the affirmative when she asked if he had been wet where
the man penetrated him. She agreed that the victim was
mentally disabled, or "a little slow."

Delbridge testified that the victim led her, her
supervisor, and several Memphis police officers to the
apartment, where they found Ross asleep on some folded
blankets on the floor. She said the victim had previously
described the perpetrator's foot odor, and she and the
other officers were able to smell Ross' feet "as soon as
[they] hit that bedroom." She confirmed that the victim
identified Ross as his rapist at the scene, and testified

5

that a gray knife was discovered near Ross' left hand on the floor under a blanket. On cross-examination, Delbridge testified that Ross checked into the Barry Homes for a visit at 5:00 p.m. and left around 5:30 or 5:40 p.m. She said the victim told her that the rape occurred between 8:00 and 8:30 p.m. She acknowledged she recognized Ross from the victim's initial description of his rapist, but was confident she did not tell the victim his name. On redirect, she testified she recognized Ross from the victim's description of his perpetrator's bad case of acne and his clothing.

Memphis Police Officer Christopher Patterson testified that shortly after midnight on July 2, 2002, the victim led him and several other officers to the Lauderdale Court apartment in which the attack had occurred, where they discovered Ross asleep on the floor. He confirmed that the victim identified Ross at the scene as the man who had raped him.

Jerry Hamilton testified he was the manager of clinical services for Case Management Incorporated, a private agency that assists clients with mental health problems to locate housing, food, and other resources in order to "make adjustments to the community" and to function as independently as possible. He said that the victim, a client of his company, had been diagnosed with a mood disorder and mental retardation and received a government disability check based on his mental disability.

Darna Davis testified she was a caseworker for Case Management, Inc., and had managed the victim's case since May. She said her understanding was that the victim had been diagnosed with both mental retardation and a mood disorder. She stated that her company managed the victim's money, paid his bills, filled and delivered his monthly prescriptions, and provided transportation for him to and from the clinic. However, the victim lived on his own at the Barry Homes, was responsible for taking his medication daily, and appeared to her to be able to take care of himself on a daily basis.

Nina Sublette, a nurse practitioner who was accepted by the trial court as an expert in the field of forensic nursing, testified she examined the victim at the Memphis Sexual Assault Resource Center at 2:30 a.m. on July 2, 2002. Although she observed nothing unusual with respect

6

to the victim's mouth and lips, she found four subacute lacerations to his anal verge, or the wrinkled part of his rectum, as well as a larger laceration located outside the anal verge at the "peri-anal skin area." All five lacerations bled easily upon slight manipulation. Sublette opined that the injuries were "very recent," had definitely occurred within the past twenty-four hours and probably within the past twelve, and were consistent with "blunt penetrating trauma." She testified there was no semen detected on the oral or rectal swabs she collected from the victim or from his underwear. On cross-examination, Sublette testified she had estimated the time of the assault as 4:00 p.m. based on what the victim told her. She acknowledged the victim told her he thought his assailant wore a condom, but could not recall if she had to first explain to him what a condom was.

Ross elected not to testify and rested his case without presenting any proof. After deliberating, the jury returned guilty verdicts in both counts of the indictment. At the conclusion of the sentencing hearing, the trial court announced that the convictions would be merged into a single judgment of conviction and applied the following enhancement factors to the offense: (2), Ross has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range; (6), Ross treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense; and (7), the personal injuries inflicted upon the victim were particularly great. Tenn. Code Ann. §§ 40-35-114(2), (6), (7) (2003). Without specifying which, the trial court also found that because of the alternate theories under which Ross had been convicted of the two separate counts, which had merged, either enhancement factor (5), the victim was particularly vulnerable because of age or physical or mental disability, or enhancement factor (10), Ross possessed or employed a deadly weapon during the commission of the offense, applied. *See id.* §§ 40-35-114(5), (10). Finding no mitigating factors applicable, the trial court enhanced Ross' sentence from the presumptive midpoint of twenty years for a Range I offender convicted of a Class A felony to twenty-four years.

State v. Ross, 2004 WL 2715348, at *1-4.

II.  <u>PETITIONER'S FEDERAL HABEAS CLAIMS</u>

In this § 2254 petition, Ross contends that his attorneys rendered ineffective assistance, in violation of the Sixth Amendment. (ECF No. 1-6 at 1.) Although Ross "adopts and incorporates" "all twenty-one instances of ineffective assistance of counsel at trial and on appeal" as "alleged in his original petition for post conviction relief filed *pro se* and Amended and Supplemental Petition For Post-Conviction Relief filed by appointed counsel James M. Gully" (ECF No. 1-6 at 9), only two issues were presented to the Tennessee Court of Criminal Appeals during the appeal of the denial of post-conviction relief.  Specifically:

(1)  Whether trial counsel was ineffective for failing to file and argue a motion to suppress identification testimony and evidence rendering the out-of-court identification of petitioner so suggestive as to result in misidentification in violation of the Due Process clauses of the United States and Tennessee Constitutions; and

(2)  Whether trial counsel was ineffective for failing to challenge or object to lay witnesses' testimony that the alleged victim was diagnosed with a mood disorder and mental retardation because of a lack of proper foundation for such testimony or qualification of the witnesses as experts?

(ECF No. 9-15 at 3).

III. <u>LEGAL STANDARDS</u>

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas

8

relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A.  <u>Exhaustion and Procedural Default</u>

Twenty-eight U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. <u>Cullen v. Pinholster</u>, ___ U.S. ___, ___, 131 S. Ct. 1388, 1398, 79 L. Ed. 2d 557 (2011). The petitioner must "fairly present"[3] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, <u>Baldwin v. Reese</u>, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349, 158 L. Ed. 2d 64 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, <u>O'Sullivan v. Boerckel</u>, 526 U.S. 837, 847-48, 119 S. Ct. 1728, 1733-34, 144 L. Ed. 2d 1 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies." <u>Adams v. Holland</u>, 330 F.3d 398, 402 (6th Cir. 2003), *cert. denied*, 541 U.S. 956, 124 S.

---

[3]    For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." <u>Anderson v. Harless</u>, 459 U.S. 4, 6, 103 S. Ct. 276, 277, 74 L. Ed.2d 3 (1982) (per curiam)(internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. <u>Gray v. Netherland</u>, 518 U.S. 152, 163, 116 S. Ct. 2074, 2081, 135 L. Ed. 2d 457 (1996).

Ct. 1654, 158 L. Ed. 2d 392 (2004); *see also* <u>Smith v. Morgan</u>, 371 F. App'x 575, 579 (6th Cir. 2010) ("<u>Adams</u> not only requires the federal courts to ensure that the state courts have the first opportunity to review and evaluate legal claims . . . but also mandates that the federal courts respect the duly-promulgated rule of the Tennessee Supreme Court that recognizes the law and policy-making function of that court and the court's desire not to be entangled in the business of simple error correction").

The procedural default doctrine is ancillary to the exhaustion requirement. *See* <u>Edwards v. Carpenter</u>, 529 U.S. 446, 452-53, 120 S. Ct. 1587, 1592, 146 L. Ed. 2d 518 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. <u>Wainwright v. Sykes</u>, 433 U.S. 72, 81-82, 97 S. Ct. 2497, 2503-04, 52 L. Ed. 2d 594 (1977), *reh'g denied*, 434 U.S. 880, 98 S. Ct. 241, 54 L. Ed. 2d 163 (Oct. 3, 1977); *see* <u>Walker v. Martin</u>, ___ U.S. ___, ___, 131 S. Ct. 1120, 1127, 179 L. Ed. 2d 62 (2011)("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30,

111 S. Ct. 2546, 2554, 115 L. Ed. 2d 640 (1991)(same).[4] If a claim has never been presented to the state courts, but a state court remedy is no longer available (*e.g.,* when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. Coleman, 501 U.S. at 731-32, 111 S. Ct. at 2555; *see also* Hicks v. Straub, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine), *cert. denied,* 544 U.S. 928, 125 S. Ct. 1653, 161 L. Ed.2d 490 (2005).[5]

     Under either scenario, a petitioner must show cause to excuse his failure to present the claim fairly and actual prejudice stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. Schlup v. Delo, 513 U.S. 298, 320-21, 115 S. Ct. 851, 864, 130 L. Ed. 2d 808 (1995); Coleman, 501 U.S. at 750, 111 S. Ct. at 2565. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime.

---

[4]     The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. Walker, __ U.S. at __, 131 S. Ct. at 1127. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* (quoting Beard v. Kindler, 130 S. Ct. 612, 618, 175 L. Ed. 2d 417 (2009)). "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Id. at 1128 (quoting Kindler, 130 S. Ct. at 618)(internal citations & quotation marks omitted).

[5]     To avoid procedural default, federal law requires a federal habeas petitioner in Tennessee to present his federal claims to the Tennessee Court of Criminal Appeals. Covington v. Mills, 110 F. App'x 663, 666 (6th Cir. 2004)

Schlup, 513 U.S. at 321, 115 S. Ct. at 864; *see also* House v. Bell, 547 U.S. 518, 536-539, 126 S. Ct. 2064, 2076-78, 165 L. Ed. 2d 1 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

B.   Merits Review

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." Cullen, ___ U.S. at ___, 131 S. Ct. at 1398 (quoting Harrington v. Richter, ___ U.S. ___, ___, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24, 123 S. Ct. 357, 360, 154 L. Ed. 2d 279 (2002) (per curiam),

*reh'g denied*, 537 U.S. 1149, 123 S. Ct. 957, 154 L. Ed. 2d 855 (Jan. 13, 2003)).[6]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Cullen, ___ U.S. at ___, 131 S. Ct. at 1399. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).[7] An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412-13, 120 S. Ct. at 1523. The state court's application of clearly established federal law must be "objectively unreasonable." *Id.* at 409, 120 S. Ct. at 1521. The writ may not

---

[6]     The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect. Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 1940, 167 L. Ed. 2d 836 (2007) (citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495, 1522, 146 L. Ed. 2d 389 (2000)).

[7]     The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (per curiam), *reh'g denied*, 537 U.S. 1148, 123 S. Ct. 955, 154 L. Ed. 2d 854 (Jan. 13, 2003); *see* Mitchell v. Esparza, 540 U.S. 12, 15-16, 124 S. Ct. 7, 10, 157 L. Ed. 2d 263 (2003) (same), *reh'g denied*, 540 U.S. 12, 16, 124 S. Ct. 1124, 157 L. Ed. 2d 956 (Jan. 12, 2004); Treesh v. Bagley, 612 F.3d 424, 429 (6th Cir. 2010) (same), *cert. denied*, ___ U.S. ___, 131 S. Ct. 1678, 179 L. Ed. 2d 622 (Mar. 21, 2011).

issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly. Renico v. Lett, 559 U.S. 766, ___, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010) (citing Williams, 529 U.S. at 411, 129 S. Ct. at 1522).

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L. Ed. 2d 738 (2010), *reh'g denied*, 130 S. Ct. 1942, 176 L. Ed. 2d 405 (Mar. 22, 2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion.[8] In Rice v. Collins, 546 U.S. 333, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination." Rice, 546 U.S. at 341-42, 126 S. Ct. at 976.

---

[8]     In Wood, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." Wood, 558 U.S. at 293, 299, 120 S. Ct. at 845, 848. However, the Court ultimately found it unnecessary to reach that issue, and left it open "for another day". *Id.* at 300-01, 303, 120 S. Ct. at 849, 851 (citing Rice v. Collins, 546 U.S. 333, 339, 126 S. Ct. 969, 974, 163 L. Ed. 2d 824 (2006) in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable).

The Sixth Circuit has described the § 2254(d)(2) standard as "demanding but not insatiable" and emphasizes that, pursuant to § 2254(e)(1), the state court factual determination is presumed to be correct absent clear and convincing evidence to the contrary. Ayers v. Hudson, 623 F.3d 301, 308 (6th Cir. 2010), *reh'g and reh'g en banc denied* (Dec. 28, 2010). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *Id.*; *see also* Hudson v. Lafler, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

There is no AEDPA deference and the standards of § 2254(d) do not apply if a habeas claim is fairly presented in the state courts but not adjudicated on the merits. Montes v. Trombley, 599 F.3d 490, 494 (6th Cir. 2010), *reh'g and reh'g en banc denied* (Apr. 20, 2010); *see* Thompson v. Warden, Belmont Corr. Inst., 598 F.3d 281, 285 (6th Cir. 2010) (a claim that is fairly presented in the state court but not addressed is subject to *de novo* review by the habeas court). The pre-AEDPA *de novo* review standard applies for questions of law and mixed questions of law and fact, and the clear error standard applies to factual findings. Montes, 599 F.3d at 494.

IV.   ANALYSIS OF PETITIONER'S CLAIMS

### Ineffective Assistance

Ross contends that his trial and appellate counsel rendered ineffective assistance, in violation of the Sixth

Amendment. A claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel is controlled by the standards stated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), *reh'g denied*, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (June 25, 1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id.* at 686, 104 S. Ct. 2064.

To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S. Ct. at 2064. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. [Strickland, 466 U.S.] at 689, 104 S. Ct. 2052. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' Id., at 687, 104 S. Ct. 2052." Harrington v. Richter, ___ U.S. ___, ___, 131 S. Ct. 770, 787, 178 L. Ed. 2d 624 (2011).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.[9] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; 104 S. Ct. at 2068. "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding. Counsel's errors must be so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Harrington*, 131 S. Ct. at 787-88 (internal citations & quotation marks omitted) (citing *Strickland*, 466 U.S. at 687, 693, 104 S. Ct. at 2064, 2052); *see also Wong v. Belmontes*, 558 U.S. 15, , 130 S. Ct. 383, 390-91, 175 L. Ed. 2d 328 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out'" a more favorable outcome to prevail. "Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different"), *reh'g denied*, 130 S. Ct. 1122, 175 L. Ed. 2d 931 (Jan. 11, 2010).

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, ___ , 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve.

---

[9] "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant[.]" *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

*Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; *see also* Bell v. Cone, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. Strickland, 466 U.S., at 690, 104 S. Ct. 2052.

Harrington, ___ U.S. at ___, 131 S. Ct. at 788.

The deference to be accorded a state-court decision is magnified when reviewing an ineffective assistance claim under 28 U.S.C. § 2254(d):

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, Knowles [v. Mirzayance], 556 U.S., at ----, 129 S. Ct. at 1420 [(2009)]. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Id.*

The Court of Criminal Appeals summarized the evidence presented at the post-conviction hearing as follows:

18

The petitioner filed a timely *pro se* petition for post-conviction relief. Thereafter, post-conviction counsel was appointed, an amended petition was filed, and an evidentiary hearing was held. At the hearing, the following pertinent testimony was presented. The petitioner testified that in October of 2002, he entered a plea of "not guilty" and trial counsel was appointed to represent him on charges of aggravated rape. According to the petitioner, trial counsel met with him only one time prior to trial. He stated that while he was in jail awaiting trial, he received the state's discovery package, however, he claimed that trial counsel did not meet with him to review the package. The petitioner denied that he spoke with trial counsel regarding an investigation of the case or potential trial witnesses. On the day of trial, counsel relayed a plea offer made by the state.

Regarding the underlying facts of the case, the petitioner testified that since 1992, he had frequently gone to Barry Homes to visit a friend. On the day of the incident, the petitioner signed into Barry Homes at 5:00 p.m. and signed out at 5:20 p.m. A surveillance camera located outside the entrance at Barry Homes would have verified his arrival and departure times. He stated that he did not ask trial counsel to obtain tapes from the surveillance camera. The petitioner denied that he saw or talked to the victim prior to July 2, 2002, the day of his arrest. At the time of his arrest, the petitioner was living on the street. He stated that he had passed out in a vacant apartment in Lauderdale Court, an abandoned public housing complex. The police awoke him, searched him, and handcuffed him. The petitioner stated that he was taken outside of the building in handcuffs, and he saw the victim standing on the sidewalk. One of the officers asked the victim, "if this was the man." The victim first said that the petitioner looked like his attacker, but then made a definite identification.

The petitioner stated that the victim did not initially identify him at the preliminary hearing and did not identify him at trial. On cross-examination, the petitioner agreed that there were a number of inmates present in the courtroom at his preliminary hearing. He further agreed that at one point during the hearing, the victim identified him as his attacker. The petitioner stated that when he was arrested, he wore a long sleeve black shirt, blue jeans, and white tennis shoes. He

agreed that at the time of his arrest, his clothes and bedding matched the victim's description of the clothes and bedding of his attacker.

Vertie McNeil, sergeant with the Memphis Police Department, testified that she was involved in the investigation of the case and identified statements she took from the victim and the petitioner. According to the victim's statement, he was attacked at approximately 4:00 p.m. on July 1. On cross-examination, Sergeant McNeil stated that the victim said that his attacker had black hair and tan skin and was wearing blue jeans, a black shirt, and white tennis shoes. According to the victim, his attacker was shorter than his own height, five feet, six inches, and he was in his 30's or 40's. When Sergeant McNeil asked the victim if he knew his attacker, he stated, "I would have known him by his face[.]" Sergeant McNeil stated that she asked the petitioner about the attack and he denied any knowledge or involvement. She stated that she was not subpoenaed to trial and did not testify.

Sharonda Hampton, lieutenant with the Memphis Police Department, testified that late on July 1, or early on July 2, 2002, she and several other officers responded to a rape call at Barry Homes. Police officers brought the victim to an abandoned apartment complex and the victim pointed out the apartment where the rape occurred. Lieutenant Hampton participated in a search of the apartment. She stated they found a man asleep on the floor with a knife beside him. The knife matched the victim's description of the knife used by his attacker. The suspect was handcuffed and brought out of the building "to see if the victim, ... could identify him." Lieutenant Hampton said she did not speak to the victim, however, according to the other officers, the victim identified the suspect as his attacker. Lieutenant Hampton testified that she did not hear any of the police officers suggest to the victim that the suspect was his attacker. On cross-examination, Lieutenant Hampton confirmed that the suspect found in the building matched the physical description given by the victim, and he was wearing clothing that matched the victim's description of the attacker's clothes.

Trial counsel testified that on October 29, 2002, the petitioner was arraigned and she was appointed to represent him. Counsel stated that she spoke to the

20

petitioner on October 29th, at three subsequent court appearances and on the first day of trial. Counsel said that she did not visit the petitioner in jail, however, she explained, "at that time we were having problems getting people down to the jail and so we would talk to people in court." Counsel stated she received discovery from the state and sent a copy of the package to the petitioner. She discussed the state's discovery package with the petitioner. She and the petitioner also discussed potential witnesses for trial. The petitioner did not ask her to contact any witnesses and did not request that she obtain surveillance tapes. Counsel obtained the petitioner's file from the attorney who had represented him in General Sessions Court. It was counsel's understanding that the petitioner wanted to proceed on the defense that the victim identified the wrong person. Counsel was aware that at the time the petitioner was found by police, he was brought out of the building in handcuffs before the victim identified him. However, she did not file a motion to suppress the identification. Regarding a note in counsel's file referring to Dr. Sandra Bolts, counsel explained that she considered having Dr. Bolts testify regarding the victim's mental condition, but decided against it. She thought that the proof at trial showed that the victim could take care of himself and that such proof was beneficial to the petitioner. Counsel stated that she did not want to do anything to make the victim appear unaware of his surroundings or unable to identify his attacker.

Counsel testified that her notes from trial indicated that Mr. Hamilton testified that the victim had a mood disorder, but was stabilized. Ms. Davis testified that she saw the victim once a month to ensure everything was going all right. According to Ms. Davis, the victim gave himself his own medicine, prepared his own food, and took care of himself. Referring to a trial transcript, counsel stated that the prosecutor asked Ms. Davis if it was her understanding that the victim "has both a mood disorder and he's also been diagnosed as mentally retarded[.]" Ms. Davis responded, "yes."

Counsel agreed that the trial court ruled that evidence of the petitioner's prior convictions would not be allowed. According to counsel, her position that the petitioner should not testify was not based on a prior conviction, but on what the petitioner told her before trial.

On cross-examination, counsel stated that the petitioner told her "he had been drinking, he was passed out, he woke up, his pants had been pulled down and [the victim] had impaled himself on [the petitioner's] erect penis." The petitioner had previously told counsel that he knew nothing about the rape or the victim. The petitioner told the attorney who represented him in General Sessions Court that he was on crack and had been up for three or four days when he went to Barry Homes to visit his friend. He told his former attorney that he only remembered leaving Barry Homes and that the victim began walking with him. The next thing he knew, he awoke with the victim on top of him.

Counsel stated that in preparing for trial, she spoke with the petitioner and all of the witnesses that she was able to interview. Counsel testified that she also reviewed a transcript of the preliminary hearing and confirmed that the victim had identified the petitioner at the hearing. Counsel spoke with the attorney who had represented the petitioner in General Sessions Court and learned that the victim had been a good witness. Counsel stated that an investigator contacted Sergeant McNeil at Juvenile Court and told her he was bringing over a subpoena for trial. When the investigator arrived, Sergeant McNeil was no longer at Juvenile Court. The investigator left the subpoena with Terry Fratesi, an assistant district attorney. Counsel stated that Officer Delbridge identified the petitioner at trial. Counsel did not pursue the issue of the identification of the petitioner because the state had not mentioned that the victim identified the petitioner at the preliminary hearing. She did not want to bring up a prior identification. After taking the matter under advisement, the post-conviction court entered an order denying the petition for post-conviction relief. The petitioner has appealed.

Ross v. State 2009 WL 2568202 at *5-7.

The Tennessee Court of Criminal Appeals cited and applied the Supreme Court's decision in Strickland v. Washington while reviewing Petitioner's claims, stating:

In order to establish the ineffective assistance of counsel, the petitioner bears the burden of proving that

22

(1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see also* Arnold v. State, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. Strickland, 466 U.S. at 688; *see also* Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance, "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; *see also* Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). Once the petitioner proves that counsel's representation fell below a reasonable standard, the petitioner must also prove prejudice. Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694. Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Id.* at 697. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id.*

Ross v. State 2009 WL 2568202 at *8.

### Counsel's Failure to File a Motion to Suppress the Victim's Initial Identification of Petitioner as his Rapist

Ross contends his identification by the victim was "impermissibly suggestive" because he was presented in handcuffs and identified only after "continued prompting by law enforcement."

(ECF No. 1-6 at 10-11.)  The State responds that the Tennessee Court of Criminal Appeals' rejection of this issue was not contrary to, or an unreasonable application of, clearly established law.  (ECF No. 8 at 11.)

The Tennessee Court of Criminal Appeals denied relief, stating:

> On appeal, the petitioner asserts that trial counsel was deficient in her representation by failing to file a motion to suppress the victim's initial identification of the petitioner. He argues that the victim's "show-up" identification of him was unreliable and made under suggestive circumstances. He asserts that trial counsel should have moved to suppress the identification made while he was in handcuffs and surrounded by police officers. The petitioner also asserts that the victim's alleged mental incapacity rendered the identification unreliable. According to the petitioner, if trial counsel had filed and argued a motion to suppress the identification, the case against him would have been reduced to purely circumstantial evidence and the likelihood of conviction would have been severely diminished.
>
> On appeal, the petitioner acknowledges the holding in Sloan v. State, 584 S.W.2d 461, 466 (Tenn. Crim. App. 1978) for the proposition, "that despite suggestiveness in the procedure employed, an out-of-court identification will withstand a due process attack if the identification itself is reliable in evaluating the totality of the circumstances." In Sloan, the court recognized that a violation of due process had occurred when the "identification procedure was so suggestive as to give rise to 'a very substantial likelihood of irreparable misidentification.'" (citing Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968)). The reliability of an identification should "be assessed in light of the suggestiveness of the identification procedure and the totality of the circumstances to determine whether a violation of due process has occurred." See id. (citing Proctor v. State, 565 S.W.2d 909, 911-912 (Tenn. Crim. App. 1978)). Factors to be considered in evaluating the reliability of an

identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *See id.* (citing <u>Proctor</u>, 565 S.W.2d at 911-912 (quoting <u>Neil v. Biggers</u>, 409 U.S. 188, 199, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972))); *see also* <u>State v. Vidal L. Strickland</u>, No. M2002-01714-CCA-R3-CD, 2003 WL 22243440, at *12 (Tenn. Crim. App., at Jackson, Sept. 30, 2003), *perm. app. denied* (Tenn. Oct. 17, 2005) (citing <u>Biggers</u>, 409 U.S. 188, 199, 93 S. Ct. 375, 34 L. Ed. 2d 401)).

Tennessee courts have rejected the use of show-up identifications to establish the identity of individuals suspected of a crime unless, "(a) there are imperative circumstances which necessitate a show-up, or (b) the show-up occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." <u>State v. Thomas</u>, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989) (citations omitted). Imperative circumstances include the commission of a serious felony where the perpetrator is still at large. *See* <u>Strickland</u>, 2003 WL 22243440, at *13 (citation omitted). An identification made during a confrontation arranged between a victim and a suspect may be reliable where the identification was part of an on-the-scene investigation and the victim not only identified the suspect, but also gave accurate descriptions of relevant details. *See* <u>Kenneth Reeder Isabell v. State</u>, No. 84-120-III, 1986 WL 1676, at *2 (Tenn. Crim. App., at Nashville, Feb. 4, 1986) (citing <u>Johnson v. State</u>, 596 S.W.2d 97 (Tenn. Crim. App. 1979); <u>State v. McDougle</u>, 681 S.W.2d 578, 581 (Tenn. Crim. App. 1984)).

In this case, the victim identified the petitioner when he was brought from the building where he was found in handcuffs. "The practice of presenting a handcuffed suspect in a one-on-one confrontation has been condemned." <u>Strickland</u>, 2003 WL 22243440, at *13 (citations omitted). However, presenting a suspect in handcuffs does not establish that the show-up identification was impermissibly suggestive when reliability of the identification may be otherwise established. *See id.* The record reveals that the identification took place within hours of the crime,

after the petitioner was found at the location identified by the victim at the crime scene, and in clothes matching the victim's description. Thus, the show-up identification was conducted as part of an on-the-scene investigatory procedure within hours of the crime. In addition, a serious felony had been committed and the armed perpetrator was still at large.

Furthermore, an analysis of the Biggers factors supports the conclusion that a substantial danger of misidentification did not exist in this case. See id. First, due to the nature of the crime and the amount of time the victim spent with the petitioner, the victim had the opportunity to clearly view his attacker. Second, the victim's description of the petitioner's clothing, hair, and actions reveal a high degree of attention paid by the victim to his assailant. Third, the victim's description matched the appearance of the petitioner at the time of his arrest. Fourth, although the petitioner testified that the victim hesitated in identifying him, Lieutenant Hampton testified at the post conviction hearing that the victim identified the petitioner without assistance. At trial, Officer Patterson verified the victim's identification of the petitioner and the crime scene. Officer Delbridge testified regarding the victim's knowledge of details which led to the discovery of the petitioner. Finally, the identification occurred within hours of the rape. Thus, all five factors support the reliability and accuracy of the identification.

In light of the foregoing, we conclude that the record supports the reliability of the victim's identification of the petitioner. The petitioner has failed to demonstrate that a motion to suppress would have prevailed or that trial counsel was deficient in failing to file the motion. Moreover, in the event that a motion to suppress the identification would have prevailed, it is not likely that the outcome of the trial would have been different. The state may prove its case entirely through circumstantial evidence where facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." State v. Smith, 868 S.W.2d 561, 569 (Tenn. 1993). At trial, Officer Delbridge testified that the petitioner visited Barry Homes on the day of the rape and that she recognized the petitioner from the victim's initial description of his perpetrator. The petitioner admitted that his clothing and bedding matched the

descriptions given by the victim. Lieutenant Hampton testified that a knife matching the victim's description was found next to the petitioner in the apartment identified by the victim as the crime scene. Even without evidence of the victim's identification of the petitioner, there was substantial evidence presented at trial to establish the identity of the petitioner as the victim's attacker. Therefore, the petitioner has failed to show prejudice as a result of trial counsel's failure to file a motion to suppress. Accordingly, we conclude that the record supports the post-conviction court's finding that trial counsel's actions were within an objective reasonable standard. The petitioner is without relief on this issue.

Ross v. State 2009 WL 2568202 at *8-10.

The Tennessee state courts reviewed the applicable Tennessee law and determined that counsel's performance was not deficient or prejudicial. Id. This Court has reviewed the transcript of Petitioner's trial, including the testimony of all witnesses. (ECF No. 9-4 at 13-133.) Before the victim took officers to Petitioner's location, the victim described the scene of the rape, what Petitioner was wearing, the color of Petitioner's knife, Petitioner's bad complexion, and his malodorous feet. (*Id.*) The officers testified that each detail of the victim's description was confirmed as accurate before Petitioner was escorted outside to be identified by the victim. (*Id.*) Furthermore, the record does not support Petitioner's allegation that the victim was prompted. (*Id.*)

27

Ross makes no argument that the decision of the Tennessee Court of Criminal Appeals was contrary to <u>Strickland</u>,[10] although he disagrees with the determination that he failed to show either deficient performance or prejudice. Petitioner has not satisfied his burden of showing that the decision was objectively unreasonable.

Based on this Court's review of the transcript of Ross' trial and the transcript of the post-conviction hearing, trial counsel did not provide ineffective assistance. Trial counsel was not deficient in failing to file a motion to suppress. The motion would not have been successful based on the reliability and accuracy of the victim's identification. The decision of the Tennessee Court of Criminal Appeals was not an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. 28 U.S.C. § 2254(d)(2). A state court's factual findings are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. *Id.*, § 2254(e)(1). The Court cannot conclude that the state courts' determinations were incorrect and DENIES this issue.

---

[10]    The Supreme Court has emphasized the narrow scope of the "contrary to" clause, explaining that "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." <u>Williams</u>, 529 U.S. at 406, 120 S. Ct. at 1520; *see also id.* at 407, 120 S. Ct. at 1520 ("If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' test becomes a nullity.").

<u>Counsel's Failure to Object to Lay Testimony about the
Victim's Diagnoses</u>

Petitioner faults trial counsel for her failure to object
to the testimony of lay witnesses about the victim's diagnoses of
a mood disorder and mental retardation. (ECF No. 1-6 at 13.) The
State responds that the state court's analysis of this issue was a
reasonable application of <u>Strickland</u>, and that Petitioner failed to
show either deficient performance or prejudice.

The Tennessee Court of Criminal Appeals denied relief on
this issue, stating:

> The petitioner also asserts that trial counsel was
> ineffective in failing to object to lay testimony
> regarding the victim's diagnoses of a mood disorder and
> mental retardation. He argues that the testimony of Mr.
> Hamilton and Ms. Davis regarding the victim's mental
> condition was offered without a proper foundation. He
> further asserts that neither Mr. Hamilton nor Ms. Davis
> testified to personal knowledge sufficient to justify the
> jury's consideration of their opinions regarding the
> victim's mental capacity. The order of the
> post-conviction court states the following findings:
>
>> Petitioner asserts trial counsel was
>> ineffective for not objecting to witnesses'
>> testimony regarding victim's previous diagnoses.
>> Specifically, Petitioner claims trial counsel should
>> have objected to Darna Davis and Jerry Hamilton's
>> testimonies concerning the victim's mood disorder
>> and mental retardation diagnoses because a proper
>> foundation was not laid nor were the witnesses
>> qualified as experts. Petitioner further contends
>> trial counsel should have proffered evidence
>> rebutting the victim's alleged mental conditions.
>> Both Ms. Davis and Mr. Hamilton testified at trial
>> that they worked for Case Management, Inc. a private
>> organization that aids clients who have mental
>> health problems, which provided the victim
>> assistance and managed his disability income. Based
>> upon the witnesses' testimonies regarding their

employer and job duties, the victim's diagnoses were
within their personal knowledge to testify about.
Therefore, a proper foundation was laid for their
testimonies. Petitioner has failed to offer any
evidence which trial counsel should have produced at
trial to rebut the victim's mental conditions.
Furthermore, the Tennessee Criminal Court of Appeals
found the evidence of the victim's mental defect
"ample." This Court finds that [counsel's]
representation did not fall below an objective
reasonable standard.

The record does not preponderate against the trial
court's findings. Because a proper foundation established
that Ms. Davis and Mr. Hamilton could testify regarding
the victim's mental condition, any objection to their
testimony regarding the victim's diagnoses would have
lacked merit. Additionally, as pointed out by the
post-conviction court, there was ample proof in the
record regarding the victim's mental condition. The
victim lived in Barry Homes, a facility reserved for the
disabled. His finances were managed and his personal care
was monitored by Case Management, Inc. Officer Delbridge
testified at trial regarding the victim's diminished
mental capacity. We conclude that the petitioner has
failed to show that trial counsel was deficient in
failing to object to testimony regarding the victim's
mental ability. The petitioner has also failed to show
that he was prejudiced. The petitioner is without relief
on this issue.

Ross v. State 2009 WL 2568202 at *10-11.

The Tennessee Court of Criminal Appeals cited and applied

the Supreme Court's decision in Strickland v. Washington. *Id.* The

Tennessee Court of Criminal Appeals held that Ross had not

established prejudice or deficient performance. (*Id.*) Based on

this Court's review of the trial transcript and the transcript of

testimony during the post-conviction hearing, the decision of the

Tennessee Court of Criminal Appeals did not "result[] in a decision

that was based on an unreasonable determination of the facts in

30

light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Ross' mischaracterization of the nature of the testimonies of Davis and Hamilton is not sufficient to demonstrate prejudice, deficient performance, or an unreasonable determination of the facts in light of the evidence presented at the state-court hearing, as required by 28 U.S.C. § 2254(d)(2).   A state court's factual findings are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary.   *Id.*, § 2254(e)(1).  The Court cannot conclude that the state court's determination was incorrect and DENIES this issue.

<u>Issues Not Raised During Post-Conviction Appeal</u>

Petitioner did not properly exhaust the remaining nineteen issues.   Petitioner did not present those claims to the Tennessee Court of Criminal Appeals in the post-conviction appeal. <u>Baldwin</u>, 541 U.S. at 29, 124 S. Ct. at 1349; <u>O'Sullivan v. Boerckel</u>, 526 U.S. at 847-48, 119 S. Ct. at 1733-34.   The issues have been exhausted through Ross' procedural default, and he has no avenue remaining for presentation of the claims given the state statute of limitations on state post-conviction relief.   This procedural default operates as a complete and independent procedural bar to federal habeas review of Petitioner's remaining nineteen claims.

Ross' contention that post-conviction counsel "abandoned" (ECF No. 1-6 at 1) these claims during the post-conviction appeal

31

provides him with no relief.  "There is no constitutional right to an attorney in state post-conviction proceedings.  Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." Coleman v. Thompson, 501 U.S. at 752, 111 S. Ct. at 2566 (internal citations omitted).  Attorney error cannot constitute "cause" for a procedural default "because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 753, 111 S. Ct. at 2566-67 (internal quotation marks omitted).  Thus, where the State has no constitutional obligation to ensure that a prisoner is represented by competent counsel, the petitioner bears the risk of attorney error. *Id.* at 754, 111 S. Ct. at 2567.[11]

This conclusion is not altered by the Supreme Court's recent decision in Martinez v. Ryan, ___ U.S. ___, ___, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012), which recognized a narrow exception to the rule stated in Coleman "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." Martinez, ___ U.S. at ___, 132 S. Ct. at 1320.  In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the initial-review

---

[11]     *See also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.*, 132 L. Ed. 2d at 1320.

*Martinez* arose under an Arizona law that does not permit ineffective assistance claims to be raised on direct appeal. *Id.* at ___, 132 S. Ct. at 1313. "[I]n Tennessee, there is no prohibition against litigation of ineffective counsel claims on direct appeal, as opposed to collateral proceedings." Leberry v. Howerton, No. 3:10-00624, 2012 WL 2999775, at *1 (M.D. Tenn. July 23, 2012) (internal quotation marks omitted). Although ineffective assistance claims are usually raised in post-conviction proceedings in Tennessee, the decision in Leberry declined to extend the reasoning of Martinez, explaining that "the equities of concern in Martinez do not extend to situations where, as here, a petitioner is represented in his post conviction proceeding by yet another attorney who is free to make the ineffectiveness of trial counsel claim." *Id.* at *2.

These issues were not overlooked by post-conviction counsel. The issues presented in the *pro se* petition filed by Ross (ECF No. 9-7 at 20-57) and the amended and supplemental petition (Am. Pet. For Post-Conviction Relief, *id.* at 69-78) were presented to the post-conviction court. Testimony was taken on those issues during the post-conviction hearing and a determination of each issue was made by the post-conviction trial court. (ECF No. 9-9 at 5-88; ECF No. 9-7 at 81-93.) As in Coleman, 510 U.S. at 755, 111 S. Ct.

at 2567, each of Ross' claims were reviewed by one court, and Martinez is inapplicable.  The procedural default occurred when post-conviction counsel exercised his discretion to limit the brief to the Tennessee Court of Criminal Appeals to the strongest arguments.  Counsel has no duty to raise frivolous issues and may exercise his discretion to limit the brief to the Tennessee Court of Criminal Appeals to the strongest arguments.[12]  Ross has not presented any evidence to justify review of these claims in order to prevent a fundamental miscarriage of justice.  Murray v. Carrier, 477 U.S. 478, 495-96, 106 S. Ct. 2639, 2649, 91 L. Ed. 2d 397 (1986).  The remaining issues presented in this petition are barred by Petitioner's procedural default.

Because the issues raised by Ross are either without merit or barred by procedural default, the Petition is DISMISSED WITH PREJUDICE. Judgment shall be entered for Respondent.

V.   APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. Miller-El v. Cockrell, 537 U.S. 322, 335, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003); Bradley v. Birkett, 156 F. App'x 771, 772 (6th Cir. 2005). The Court must issue or deny a certificate of appealability ("COA") when it enters

---

[12]    See Smith v. Murray, 477 U.S. 527, 536, 106 S. Ct. 2661, 2667, 91 L. Ed. 2d 434 (1986) (the failure to raise a non-frivolous issue on appeal does not constitute per se ineffective assistance of counsel, as "[t]his process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy") (internal quotation marks and citation omitted).

a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El, 537 U.S. at 336, 123 S. Ct. at 1039 (citing Slack v. McDaniel, 529 U.S. 473, 84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542 (2000)); Henley v. Bell, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same), cert. denied, 555 U.S. 1160, 129 S. Ct. 1057, 173 L. Ed. 2d 482 (2009). A COA does not require a showing that the appeal will succeed. Miller, 537 U.S. at 337, 123 S. Ct. at 1039; Caldwell v. Lewis, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. Bradley, 156 F. App'x at 773 (quoting Slack, 537 U.S. at 337, 123 S. Ct. at 1039).

In this case, there can be no question that the claims in this petition are either without merit or barred by procedural default. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court DENIES a certificate of appealability.

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is DENIED.[13]

IT IS SO ORDERED this 25th day of July, 2013.

**s/ S. Thomas Anderson**

S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

---

[13]     If Petitioner files a notice of appeal, he must pay the full $455 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).

36